Argued and submitted October 6, 1983, reversed, Employment Division decision reinstated January 15, 1985

# SALEM COLLEGE & ACADEMY, INC.,
*Respondent on Review,*

*v.*

# EMPLOYMENT DIVISION,
*Petitioner on Review.*

## (80-T-56; CA A20465; SC 29528)

695 P2d 25

James E. Mountain, Jr., Solicitor General, Salem, argued the cause and filed a brief for petitioner on review. With him on the petition were Dave Frohnmayer, Attorney General, Stanton F. Long, Deputy Attorney General, William F. Gary, Deputy Attorney General and Jan Peter Londahl, Assistant Attorney General, Salem.

Paul M. Fletcher, Salem, argued the cause and filed a brief for respondent on review.

Leslie M. Roberts, Portland, filed an amicus curiae brief for American Civil Liberties Union Foundation of Oregon, Inc. With her on the brief were Rex Armstrong and Charles F. Hinkle, Portland.

LINDE, J.

**LINDE, J.**

Oregon's unemployment compensation law, ORS chapter 657, excludes from covered "employment" services performed for certain religious organizations, thus exempting such organizations from taxation to support unemployment benefits. The statutory formula for the exclusion, ORS 657.072(1), deliberately mirrors the corresponding formula of the Federal Unemployment Tax Act, 26 USC § 3309(b)(1) (1982), so as to maintain the coverage required to protect the federal tax credits and federal grants on which the national unemployment compensation system is built. On petition by Salem College & Academy to review defendant's assessment of unemployment taxes against it, the Court of Appeals held the state and federal formula unconstitutional as an establishment of religion forbidden by the First Amendment insofar as the formula discriminates between a religious school affiliated with and one independent of a church or association of churches. *Salem College & Academy, Inc. v. Emp. Div.,* 61 Or App 616, 659 P2d 415 (1983). We allowed review to examine whether this constitutional holding was necessary and correct. We reverse the Court of Appeals.

## I. THE DISPUTED EXEMPTION

Both the statutory scheme and the administrative proceedings and findings in this case are comprehensively set out in the opinion of the Court of Appeals. In summary, Congress originally exempted charitable, educational, and other tax-exempt organizations from federal unemployment compensation taxes and from obligatory coverage under state unemployment compensation laws. Coverage later was expanded until the present version, enacted in 1976, excludes (apart from ministers and members of religious orders) only employment by a church or convention or association of churches, or by "an organization which is operated primarily for religious purposes and which is operated, supervised, controlled, or principally supported by a church or convention or association of churches." 26 USC § 3309 (b)(1). Accordingly, the Legislative Assembly in 1977 amended ORS 657.072, the exemption for nonprofit employers. Previously this section had expressly excluded from coverage services performed "(c) In the employ of a school which is not an institution of higher education." After the amendments to conform to changes in FUTA, ORS 657.072(1)(a) provides:

"(1) 'Employment' does not include service performed:

"(a) In the employ of:

"(A) A church or convention or association of churches;

"(B) An organization which is operated primarily for religious purposes and which is operated, supervised, controlled or principally supported by a church or convention or association of churches * * *."

Or Laws 1977, ch 446, § 4. The intended significance of repealing the previous express exclusion of schools is important in interpreting the present law.

In resisting the imposition of liability for unemployment compensation paid to four of its former employees, petitioner Salem College & Academy, Inc., (hereafter the Academy) claimed that it qualified either as a church or as "principally supported" by churches within ORS 657.072(1)(a), and that otherwise the imposition of coverage on it would violate a number of state and federal constitutional guarantees. After a hearing, the Employment Division rejected these contentions and affirmed the tax assessment.

The Court of Appeals described the Academy as follows:

"Petitioner is an interdenominational Christian primary and secondary school founded in Salem in 1945 by the pastor and laymen of a local church. It is organized as a nonprofit corporation, registered with the Oregon Department of Education, exempt from federal income tax under section 501(c)(3) of the Internal Revenue Code and governed by a 16-member Board of Trustees. It enrolls 750 students and employs approximately 50 teachers, in addition to administrative and staff personnel. Its expenses average approximately $1400 per student per year, revenues are derived from tuition and donations, and the average student tuition is $1,200 per year.

"One of the petitioner's principals summarized the purpose of the school:

'[Its] purpose is to teach and train children and young people to a life of service to God. It makes no difference if that service is as a lawyer or a doctor or a plumber: the whole focus of living is to please God. And that is why we exist, to train every single child that they'll function in

society, in their church, in their home in a way that honors God.'

"Specific religious training includes daily Bible study, prayer and twice-weekly chapel services. Moreover, petitioner's Parent and Student Handbook provides:

" 'The place of Christ is paramount in education, and should permeate every phase of the school—academics, athletics, activities, the lunchroom, playground, etc. Jesus Christ is not appendage to education, He is the center of it.'

"All staff, including maintenance personnel, school administrators, school store operator and teachers are presented to students as examples of faith-in-action and are expected to proclaim the teachings of Jesus Christ to the students. Teachers are selected on the basis of their ability to teach from 'God's perspective' and are expected to exert a spiritual influence on the lives of their students. All teaching must accord with petitioner's doctrinal statement of faith, and the teaching of doctrine peculiar to any denomination is forbidden. Each teacher must be an active member of a local church. Each teacher is evaluated annually and is subject to dismissal if his or her performance does not meet petitioner's standards. In addition, all staff are subject to dismissal for failure to comply with petitioner's code of ethics. Among other things, the code requires that each staff member be a 'regenerated person, who is confident of the leading of the Holy Spirit to the work here as his opportunity to make Christ known by life and word.'

"Petitioner is not affiliated with any specific church or denomination and is open to students of all denominations. Approximately 60 to 80 local churches participate in petitioner's activities. In selecting board members, petitioner attempts to have a fair representation of the churches that send it students. Petitioner's personnel serve as substitute pastors, and the local clergy serve as substitute teachers and speak at chapel services. The local churches encourage enrollment in the school and contribute funds or encourage their members to do so. Petitioner could not survive if it lost the support of the major churches in Salem's evangelical community."

61 Or App at 618-20, 659 P2d at 417.

The referee concluded that the Academy is not itself

a "church" nor principally supported by a "church or convention or association of churches" as those terms are used in the law. The Court of Appeals held that these administrative determinations were not erroneous, and that it therefore had to consider the constitutionality of the distinction between religious schools like the Academy and otherwise identical religious schools closely affiliated with one or more churches. *Id.* at 625, 659 P2d at 420.

## II. RELATION OF STATE AND FEDERAL LAW

We begin by outlining the complex structure of the problem before us. The complexity arises from the relation between state and federal law before reaching a question of the relation between church and state.

Seen from the national perspective, the Federal Unemployment Tax Act (FUTA), 26 USC §§ 3301 to 3311 (1982), is a tax law, as its name indicates. The Congress that enacted it in 1935 did not undertake to create a nationally administered unemployment compensation system. Whether by reason of constitutional misgivings,[1] tradition, or policy, the choice was to leave unemployment insurance programs to the states, but to impel them to adopt adequate programs whose costs individual states were reluctant to impose on their domestic enterprises for fear of placing them at a competitive disadvantage. The chosen device was a federal payroll tax on employers, 90 percent of which could be offset by any payments a state might exact for a state unemployment compensation program that met prescribed federal standards.

FUTA did not and does not purport to command states to maintain unemployment compensation programs; it relies on the incentive not to expose the state's employers to a federal payroll tax without the credit allowed for a state tax. Nor does FUTA prevent a state from extending the coverage of its unemployment insurance laws beyond federal requirements. Compliance of a state's program with the standards stated in FUTA and interpreted and administered by the United States Department of Labor therefore is not com-

---

[1] The breadth of national power to "lay and collect Taxes [to] provide for the * * * general Welfare of the United States," US Const, Art I, § 8, was still doubtful in 1936; *see United States v. Butler,* 297 US 1, 56 S Ct 312, 80 L Ed 477 (1936).

manded by the Supremacy Clause;[2] constitutionally, compliance is voluntary on the part of the state, though not practically or politically so. FUTA addresses taxpayers, not state legislatures. This view of the scheme was sustained in *Steward Machine Co. v. Davis,* 301 US 548, 57 S Ct 883, 81 L Ed 1279 (1937). Whether a state chooses to conform its law to federal standards is its own business, as far as FUTA is concerned.

■ From the perspective of a state court, accordingly, a taxpayer's challenge to collection of the state's unemployment tax involves in the first instance an interpretation of the state's law. A state law may have been designed to meet the standards that will qualify the state for a federal benefit, in this instance to qualify local employers for a federal tax credit. It is possible, however, that a state law fails to meet federal standards in some respect, or that it originally meets them but federal standards subsequently change. When such a situation presents a conflict between two regulatory statutes, the Supremacy Clause obliges a court to apply the federal law, but as already noted, that obligation is not characteristic of programs sometimes described as "cooperative federalism" such as unemployment compensation. *See Carmichael v. Southern Coal & Coke Co.,* 301 US 495, 525-26, 57 S Ct 868, 880, 81 L Ed 1245, 1262 (1937). If a state's program fails to meet federal standards, ordinarily this failure neither violates federal law nor invalidates the state's law; it forfeits the federal benefit.

■■ Examination of the state's law includes the state's constitution. Again, if federal law imposes a binding obligation on a state, its constitution cannot obstruct that obligation; but a legislature cannot violate the state's constitution in order to qualify for a benefit that Congress leaves optional.

The relationship becomes difficult when a court is convinced that the legislature enacted a law with the intent of meeting all applicable federal standards, but there is doubt

---

[2] US Const, Art VI, §2:

"This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."

what those standards are. The law, of course, may leave a state agency sufficient discretion to administer and adapt its program as needed to qualify for federal funds. Even a nondiscretionary statute can be interpreted once to enact whatever the federal law requires at that time. Once interpreted, however, the same statute may fall short of later changes in federal requirements, and legislative amendment may be needed. A court therefore must be cautious in construing the state statute to conform to a federal agency's current views of the corresponding federal standards, if those views are debatable and subject to change by the agency or by a different judicial interpretation of the federal statute.

■　　Finally, the federal statute, or its interpretation by the federal agency, may be invalid under the United States Constitution. In consequence, a court seeking to interpret and apply the state's law may find itself obliged to examine the validity of a federal agency's interpretation of a federal statute and even the constitutionality of the federal statute itself. No state court can have the final word on these federal questions; but until the United States Supreme Court decides them, the state court in that respect is in the same position as a lower federal court. And a state supreme court does have to reach a final decision as to the state law that seeks to take advantage of the disputed federal statute. That is the awkward situation presented by this case.

### III. SUPREME COURT'S INTERPRETATION OF 26 USC § 3309(b)(1)(A)

Unemployment tax coverage of religious schools became a subject of widespread dispute when Congress in 1976 repealed the previous exclusion of schools from compulsory coverage but left in place the exclusion of services performed in the employ of churches or of church-supported organizations operated primarily for religious purposes. The Oregon legislature's 1977 amendment of ORS 657.072(1)(a) unquestionably was intended to satisfy the revised FUTA requirement, but the revised requirements were in doubt. Were religious schools "schools" whose exemption had been repealed or organizations "operated primarily for religious purposes" whose exemption survived?

That the 1976 amendment of FUTA created an ambiguity with respect to religious schools should have been

fairly obvious, but the congressional reports accompanying the amendment did not expressly address it. The repeal of the general exclusion of schools was a response to demands by teachers' organizations faced with widespread unemployment among teachers, and in 1978 the Secretary of Labor interpreted the repeal as placing church-related schools along with others under FUTA's standards for state unemployment compensation coverage.[3] In 1979, the Secretary instituted proceedings to disqualify state plans that continued to exempt church schools because such plans did not conform to FUTA. During the same period, religious schools or their church sponsors around the country challenged unemployment taxes under the amended coverage on statutory and constitutional grounds.[4]

The uncertainty posed a problem for courts seeking to interpret state statutes so as to maintain conformity with FUTA. Of course, if a state assumed along with the Secretary of Labor that the amended FUTA required coverage of all schools, such an interpretation would preserve the eligibility of the state's program even if the Secretary's interpretation later proved unduly stringent. Such an interpretation also would avoid constitutional concerns about distinguishing religious schools by the degree of their affiliation with churches, although churches argued to the contrary that subjecting their schools to unemployment taxation would interfere with their exercise of religious freedom.

We are, however, no longer free to attribute this interpretation to FUTA, as distinct from ORS 657.072(1). In 1980, the South Dakota Supreme Court interpreted its unemployment compensation law consistently with the Secretary of Labor's interpretation of congressional intent in order to maintain South Dakota's compliance with FUTA. *Matter of*

---

[3] The history of these developments is reviewed in Comment, *Bringing Christian Schools Within the Scope of the Unemployment Compensation Laws: Statutory and Free Exercise Issues,* 25 Vill L Rev 69, 82-90 (1979); Note, *Redemption Through Exemption: Unemployment Insurance and Sectarian Schools,* 55 NYU L Rev 242, 246-50; Comment, *The Federal Unemployment Tax Act and the Taxation of Religious Institutions,* 15 Land and Water L Rev 671, 674-76 (1980).

[4] See cases cited in 25 Vill L Rev, *supra* at 88-89. Two Oregon cases resulted in holdings against coverage. *Emp. Division v. N.W. Christian College,* 31 Or App 201, 570 P2d 100 (1977), *Emp. Division v. Archdiocese of Portland,* 42 Or App 421, 600 P2d 926 (1979).

*Northwestern Lutheran Academy,* 290 NW2d 845 (SD 1980). The United States Supreme Court reversed the South Dakota court's holding as to FUTA, though recognizing that the court was free on remand to hold to its interpretation of South Dakota law. *St. Martin Lutheran Church v. South Dakota,* 451 US 772, 780 n 9, 101 S Ct 2142, 2147 n 9, 68 L Ed 2d 612, 619 n 9 (1981).[5]

As to FUTA, the United States Supreme Court held that when Congress added section 3309, in 1970, it drew a distinction between employees "of a church or convention or association of churches" on one hand and employees of "separately incorporated" organizations on the other. *Id.* at 782, 101 S Ct at 2148, 68 L Ed 2d at 620, citing HR Rep No. 91-612, p.44 (1969). This meant a "distinction between church schools integrated into a church's structure, and those separately incorporated." 451 US at 783, 101 S Ct at 2148, 68 L Ed 2d at 620. In 1970, according to the Court, "§ 3309(b)(1)(A) was meant to apply to schools, like petitioners', that have no separate legal existence from a church, or, as in the Academy's case, from a 'convention or association of churches.' " *Id.* at 784, 101 S Ct at 2149, 68 L Ed 2d at 621. The Court further held that the 1976 amendment did not expressly or impliedly change this test of § 3309(b)(1) as applied to church-related schools when it dropped the exemption of schools generally by repealing § 3309(b)(3). The Court therefore did not reach petitioners' claims for exemption under the First Amendment. *Id.* at 788, 101 S Ct at 2151, 68 L Ed 2d at 624.

Following the Supreme Court's *St. Martin Lutheran Church* decision, the Secretary of Labor issued certifications of conformity to the states against which he had initiated proceedings, including Oregon. The Secretary noted that questions remaining after *St. Martin* concerning coverage of church schools would "be dealt with upon the basis of final action in the *Grace Brethren* case." 46 Fed. Reg. 43,524 (1981).

This referred to the appeal in *Grace Brethren Church v. California,*[6] a case in which a number of religious schools

---

[5] On remand, the South Dakota court adopted the Supreme Court's interpretation. 308 NW2d 401 (SD 1981).

[6] The district court's opinions in the case are not officially reported, but a supplemental and second supplemental opinion appear in [1981 Transfer Binder] Unempl. Ins. Rep. (CCH) Paragraphs 21,634 and 21,644. Our references are to that source.

sued the State of California and the United States in the United States District Court for injunctive relief from application of California's unemployment compensation tax. In *Grace Brethren Church,* the Secretary of Labor defended his view that § 3309 (b)(1) does not exempt personnel employed by religious schools but only services performed in the execution of church duties. That view subsequently was rejected by the Supreme Court in *St. Martin Lutheran Church v. South Dakota, supra,* when the Court held that § 3309(b)(1)(A) exempted services for church schools that are integrated into a church's structure.

Meanwhile the district court in *Grace Brethren Church* held that § 3309(b)(1) did not require the exclusion of employment by religious schools operated independently of church supervision, control, or principal support. But that holding lost whatever precedential value it might have when the Supreme Court, on direct appeal, decided that the district court lacked jurisdiction to enjoin the collection of the state tax. *California v. Grace Brethren Church,* 457 US 393, 102 S Ct 2498, 73 L Ed 2d 93 (1982)(applying 28 USC § 1341). The case therefore did not provide the answer upon which the Secretary expected to base his future determinations whether a state law conforms to the requirements of FUTA, and we know of no further ruling whether § 3309(b)(1) allows qualified state programs to exempt the employees of church operated but separately incorporated religious schools.

■■ The present case would avoid constitutional difficulties if petitioner qualified for exemption as a church or as "principally supported" by one or more churches. If ORS 657.072(1)(a) could be so interpreted and applied, it should be. Statutes should be interpreted and administered to be consistent with constitutional standards before attributing a policy of doubtful constitutionality to the political policymakers, unless their expressed intentions leave no room for doubt. *See Planned Parenthood Assn v. Dept. of Human Res.,* 297 Or 562, 687 P2d 785 (1984). In this case, however, we are unable to say that the Employment Division misapplied the statute when it held that the Academy is neither a church nor "principally supported" by churches.

■ The Court of Appeals began its analysis with the undisputed premise that in enacting ORS 657.072(1), the

Legislative Assembly intended to maintain Oregon's confor-
mity to FUTA. The court discussed the United States District
Court's opinion in *Grace Brethren Church, supra;* but we think
that, in view of the subsequent fate of that decision, the
relevant source of guidance is the Supreme Court's decision in
*St. Martin Lutheran Church v. South Dakota, supra.* In *St.
Martin Lutheran Church,* as we have noted, the Supreme
Court read § 3309(b)(1) as drawing a distinction between
employees of a church or convention or association of
churches and employees of "separately incorporated" organi-
zations.

> "The former uniformly would be excluded from coverage
> by § 3309(b)(1)(A), while the latter would be eligible for
> exclusion under § 3309(b)(1)(B) only when the organization is
> 'operated, supervised, controlled, or principally supported by
> a church or convention or association of churches.'[12]"

451 US at 782, 101 S Ct at 2148, 68 L Ed 2d at 620. The
accompanying footnote 12 repeated the point:

> "The importance of this distinction, and of giving mean-
> ing to both (A) and (B), is heightened by the great diversity in
> church structure and organization among religious groups in
> this country. * * * This diversity makes it impossible, as
> Congress perceived, to lay down a single rule to govern all
> church-related organizations. Our holding today concerns
> only schools that have no legal identity separate from a
> church. To establish exemption from FUTA, a separately
> incorporated church school (or other organization) must
> satisfy the requirements of § 3309(b)(1)(B): (1) that the
> organization 'is operated primarily for religious purposes,' and
> (2) that it is 'operated, supervised, controlled, or principally
> supported by a church or convention or association of
> churches.'
>
> "Because we hold petitioners exempt under § 3309
> (b)(1)(A), we leave the issue of coverage under § 3309
> (b)(1)(B) for the future."

In the course of rejecting the Department of Labor's narrow
reading of "church" as a house of worship, the Court noted:

> "Section 3309(b), exempting 'services performed — (1) in
> the employ of (A) a church * * *,' is phrased entirely in terms
> of the nature of the *employer* and not in terms of the work
> performed or the place at which the employee works. * * * The
> word 'church' in § 3309(b) must be construed, instead, to refer
> to the congregation or the hierarchy itself, that is, the church

authorities who conduct the business of hiring, discharging, and directing church employees.

"We conclude that, at the time of its enactment in 1970, § 3309(b)(1)(A) was meant to apply to schools, like petitioners', that have no separate legal existence from a church, or * * * from a 'convention or association of churches.' "

451 US at 783, 101 S Ct at 2149, 68 L Ed 2d at 621 (footnote omitted).

In short, the Court stated that § 3309(b)(1) drew the line between persons employed (hired, discharged, and directed) directly by a church itself as the employer and persons employed by organizations that have a "separate legal existence." The latter organizations must meet the criteria of § 3309(b)(1)(B) in order to qualify for exemption. The constitutionality of those criteria, specifically the test of the organizations' church affiliation, was not at issue because *St. Martin Lutheran* involved direct employment by a church.

The Supreme Court's opinion on appeal in *Grace Brethren Church* contained a footnote which the Court of Appeals in the present case understood to say, possibly in dicta, that there is no statutory exemption for unaffiliated religious schools.[7] The footnote occurs in a part of the opinion addressed to the question whether the district court held § 3309(b) unconstitutional, so as to allow a direct appeal to the Supreme Court, and we read it as describing the district court's holding rather than a holding of the Supreme Court. It

---

[7] The district court described three categories of religious schools under the statute: Category I schools, integrated into the church structure; Category II schools, church-affiliated but separately incorporated; and Category III schools, independent and unaffiliated religious schools.

The footnote reads:

"The court's analysis of Category I and II schools also demonstrates that it believed FUTA, as applied to Category III schools, to be unconstitutional. In its discussion of Category I and II schools, the court held that if it were to follow the Secretary's interpretation of § 3309, i.e., if *no* exemption existed, then FUTA would be unconstitutional as applied to those schools in part because of the excessive governmental entanglement in the benefit elegibility hearing. See n. 12, *supra*. Since the court also found an entanglement problem with respect to benefit eligibility hearings for Category III schools, and since there is no statutory exemption for those schools, it follows that the District Court must have believed that FUTA was unconstitutional as applied to the Category III plaintiffs."

457 US at 406 n. 18, 102 S Ct at 2507 n. 15, 73 L Ed 2d at 105 n. 18.

may well be a correct statement concerning such schools, as the Court of Appeals thought. But we see no reason to believe that the Supreme Court has decided that FUTA constitutionally draws a line including or excluding unemployment benefit coverage for employees of separately incorporated religious schools by the organizations' dependence upon a church. The sentences we have quoted from *St. Martin Lutheran Church, supra,* hold only that direct church employees need not be covered.

The placement of that line bears on the constitutionality of both the state and the federal statutes. As the Supreme Court did not reach those questions, we must proceed to consider them with respect to ORS 657.072(1) without certainty how our conclusion will affect the congruence between that section and § 3309(b)(1).

## IV. OREGON CONSTITUTIONAL GUARANTEES

■ The Academy contended in the Court of Appeals that if it were not exempted by the statutes, as it claims to be, those statutes would violate both the Oregon and the United States Constitutions. The Court of Appeals held that the statutory distinction between church-supported and independent religious schools constitutes an establishment of religion forbidden by the First Amendment, and it stated that "[i]n view of our conclusion with respect to the federal Constitution, we need not, and do not, consider the Oregon Constitution." 61 Or App at 618 n.1, 659 P2d at 417 n. 1. That approach departed from the judicial responsibility to determine the state's own law before deciding whether the state falls short of federal constitutional standards, *see State v. Atkinson* 298 Or 1, 688 P2d 832 (1984); *State v. Kennedy,* 295 Or 260, 666 P2d 1316 (1983); *Hewitt v. SAIF,* 294 Or 33, 653 P2d 970 (1982); *Sterling v. Cupp,* 290 Or 611, 625 P2d 123 (1981); *State v. Scharf,* 288 Or 451, 605 P2d 690 (1980). It is, of course, proper to take account of federal requirements (in this case statutory as well as constitutional) in deciding what the state's law is, *see Tharalson v. Dept. of Rev.,* 281 Or 9, 573 P2d 298 (1978); but, as already noted, the state cannot violate its own constitution in order to satisfy a federal program that Congress has not made obligatory under the Supremacy Clause. We therefore examine the issues raised under the Oregon Constitution.

The Academy invokes the sections of Article I dealing

with freedom of conscience and of religion as well as the guarantee of equal privileges and immunities stated in section 20.[8] We do not accept the Academy's contention that the statutory obligation to provide unemployment coverage for its employees would invade its religious freedom even if it were applied equally to all schools or all religious organizations along with other employers, without distinctions of organizational form or religious affiliation. The Academy argues that the obligation either to pay a payroll tax or to reimburse the state for unemployment compensation paid to its former employees burdens its exercise of its religious mission in a number of respects. Most of these burdens are either financial obligations or clerical obligations ancillary to compliance with the financial obligations.

As to financial burdens, the question of the historic tax exemptions for religious institutions has been whether the practice is a forbidden subsidy or "establishment" of religion not whether exemption is required.[9] A number of state constitutions, not including Oregon's, exempt religious institutions along with others from taxes,[10] but petitioner cites no

---

[8] Or Const, Art I, §§ 2-5:

"All men shall be secure in the Natural right, to worship Almighty God according to the dictates of their own consciences.

"No law shall in any case whatever control the free exercise, and enjoyment of religeous (sic) opinions, or interfere with the rights of conscience.

"No religious test shall be required as a qualification for any office of trust or profit.

"No money shall be drawn from the Treasury for the benefit of any religeous (sic), or theological institution, nor shall any money be appropriated for the payment of any religious (sic) services in either house of the Legislative Assembly."

Art I, § 20:

"No law shall be passed granting to any citizen or class of citizens privileges, or immunities, which, upon the same terms, shall not equally belong to all citizens."

[9] See Stokes and Pfeffer, Church and State in the United States 546-553 (1964); Kauper, *The Constitutionality of Tax Exemptions for Religious Activities*, in Oaks, The Wall Between Church and State 95-116 (1963); Van Alstyne, *Tax Exemption of Church Property*, 20 Ohio St L J 461 (1959); Bittker, *Churches, Taxes and the Constitution*, 78 Yale L J 1285 (1969). The United States Supreme Court's decision sustaining property tax exemptions for churches against attack under the First Amendment's establishment clause contains no hint that exemption might be required by the amendment's free exercise clause. *Walz v. Tax Commission*, 397 US 664, 90 S Ct 1409, 25 L Ed 2d 697 (1970).

[10] See Antieau, Carrol and Burke, Religion Under the State Constitutions 120-172

support for the proposition that exemption from common financial exactions follows from guarantees of free exercise of religion or conscience alone.[11]

The exaction here is in no way based on activities or resources that are more characteristic of schools than of other kinds of employers or institutions, let alone on a school's religious character or the content of its programs. The obligation to provide unemployment coverage focuses solely on the economic and social aspect of the employment relation and the cost that unemployment imposes on the discharged employee and on society. It is not even an inescapable tax burden, because the law allows a nonprofit employer instead to reimburse the state unemployment compensation fund in amounts equal to the actual unemployment benefits attributed to a claimant's service for the employer. ORS 657.505(8); 26 USC § 3309(a)(2); *cf. In the matter of Northwestern Lutheran Academy,* 290 NW2nd at 850. These payments are financial burdens only in the same sense that the costs of employing paid workers at all are financial burdens; a

---

(1965). Article IX, section 1, of the Oregon Constitution originally read:

"The Legislative Assembly shall provide by law, for a uniform, and equal rate of assessment and taxation, and shall prescribe such regulations as shall secure a just valuation for taxation of all property, both real, and personal, excepting such only for municipal, educational, literary, scientific, religeous, (sic) or charitable purposes, as may be specifically exempted by law."

When the amendment which revised the uniformity requirement and repealed the listed exceptions was submitted to the voters in 1917, opponents argued in the Voters' Pamphlet:

"A new issue arises in H.J.R. 16 by omitting all exemptions from the constitution and requiring the educational, municipal, philanthropic and religious institutions to be listed like other property.

"The proposed change would be an undeserved burden upon all religious and philanthropic institutions. Such institutions being nonlucrative and existing only for the material and moral betterment and relief of the people, should not be subject to taxation. To tax such institutions would prove a serious discouragement of the highest and best activities of the state."

Constitutional Amendments and Measures to be Submitted to the Voters of Oregon, Special Election, June 4, 1917, 16. The argument for the proponents made no reference to the significance of this repeal. *Id.* at 14. It was not discussed in *Corporation of Sisters of Mercy v. Lane County,* 123 Or 144, 261 P 694 (1923).

[11] Some decisions in fact have held religious activities constitutionally immune from certain taxes on the "privilege" of conducting activities such as the distribution of books or other literature. *See, e.g., Follett v. McCormick,* 321 US 573, 64 S Ct 717, 88 L Ed 938 (1944); *Murdock v. Pennsylvania,* 319 US 105, 63 S Ct 870, 87 L Ed 1292 (1943).

religious association engaged in the free exercise of worship or other religious activity without employing paid personnel pays no unemployment tax.

As to the alleged administrative and clerical burdens, such as posting notices, filing reports and keeping payroll records subject to inspection by the Employment Division, these requirements, too, are tailored to the economic aspect of the employment relation and not to any activities peculiarly characteristic either of schools or of religious programs. They are not different in principle from a host of other secular regulatory requirements such as health inspections of cafeteria workers or kitchens, safety inspection of school busses, and licensing of drivers.

Two of the Academy's other claims under the free exercise clauses deserve attention. One is that the Academy cannot maintain the doctrinal standards required of its employees and discharge an employee for failing to meet those standards without opening its doctrines and faith to Employment Division scrutiny in protracted and expensive contests over unemployment benefits, administrative determinations that will "entangle" the state in religion. This eventuality can adequately be dealt with if and when it happens; we have no reason to believe that discharges of school employees over matters of religious doctrine are so frequent as to require the employer's entire exemption from the unemployment compensation system on that account.[12]

There is substance to the Academy's second claim,

---

[12] In view of our eventual holding that Oregon law does not exempt the Academy from liability for unemployment payments, we need to say that the reasons stated in the text also seem to us to meet the Academy's claim for exemption under the First Amendment. There is a paragraph in *NLRB v. Catholic Bishop of Chicago,* 440 US 490, 99 S Ct 1313, 59 L Ed 2d 533 (1979), concerning the National Labor Relations Board's jurisdiction over church schools, that reserved judgment on the board's argument that it could avoid excessive entanglement since it "will resolve only factual issues such as whether an anti-union animus motivated an employer's action." The Supreme Court observed that "inevitably the Board's inquiry will implicate sensitive issues that open the door to conflicts between clergy-administrators and the Board, or conflicts with negotiators for unions." 440 US at 503, 99 S Ct at 1320, 59 L Ed 2d at 543. But the Court held only that the National Labor Relations Act did not clearly extend to faculty members of church-operated schools. Whether or not that result also is mandated by the First Amendment, we think the risk of state involvement in internal "conflicts" is less in administering unemployment compensation than in administering the collective bargaining process.

that the distinction made by the unemployment compensation law between church-related and independent religious schools in effect compels the Academy to "reorganize as a church" or affiliate with a church in order to avoid liability for unemployment compensation. Although the Academy presents this as a direct claim of religious freedom, it is a result of the statutory distinction and would disappear if that distinction did not exist. The claim therefore is bolstered by invoking the guarantee of equal privileges and immunities of Article I, section 20. Against that, it might be argued that distinctions based on organizational form such as, for instance, between incorporated and unincorporated enterprises ordinarily cause no constitutional problem of equal treatment, so that the similar distinctions among religious schools become problematic only by virtue of the constitutional clauses dealing with religious freedom. *See Carmichael v. Southern Coal & Coke Co., supra* (sustaining FUTA against claims under the Fourteenth Amendment).

 It is not crucial to decide how much Article I, section 20 contributes to petitioner's claim that the state cannot extend to church-affiliated religious schools an immunity that does not "upon the same terms * * * equally belong" to unaffiliated religious schools like itself.[13] Equality of privileges among religious institutions is implicit in the religion

---

[13] The Employment Division objects that the Academy, being a corporation, is not a "citizen" entitled to invoke Article I, section 20, citing *State v. James,* 189 Or 268, 219 P2d 756 (1950). The opposite argument was made against a tax exemption for an incorporated charitable hospital in *Corporation of Sisters of Mercy v. Lane County, supra* note 10. Without here pursuing that issue with respect to business corporations with widely held or publicly traded capital stock, we are not prepared to hold that individual Oregon residents or identifiable individuals associated for a common purpose such as the conduct of the Academy lose the state's guarantee of non-discriminatory treatment because they choose to take advantage of incorporation under the state's laws.

The Employment Division also suggests that in order to avoid the pitfalls intrinsic in analyzing legislative classifications for equality, the guarantee stated in Article I, section 20 should be limited to "fundamental" rights as that term was used in an 1823 interpretation of the Privileges and Immunities Clause of the United States Constitution, Article IV, section 2. *Corfield v. Coryell,* 6 Fed Cas 546 (1823). The division presents an interesting historical argument. But Article IV, section 2 concerns interstate rights of persons in a federal system rather than governmental favoritism among a state's own citizens, and this court has not held it necessary to characterize some rights as fundamental before testing such favoritism under Article I, section 20. *See, e.g., Hewitt v. SAIF, supra* (beneficiaries' rights under workers' compensation law); *State v. Freeland,* 295 Or 367, 667 P2d 509 (1983)(choice between accusatory procedures).

clauses themselves. Article I, sections 2 and 3 do not speak of religion in the singular; nor do they refer to churches. They speak of men's rights to worship "according to the dictates of their own consciences" and the "enjoyment of religious opinions" in the plural.

Religious pluralism is at the historic core of American guarantees of religious freedom. This pluralism was expressed at Oregon's constitutional convention as the main reason for separating the state from churches and religion. The Academy quotes Judge Matthew P. Deady, president of the convention, defending the separation between the state and churches (and the proscription of employing a chaplain, Or Const, Art I, § 5) "[b]ecause the country contains persons of all religious denominations, as well as nonbelievers," and delegate Waymire: "The people of this country were composed of every shade of opinion upon the subject of religion, from the half-crazed fanatic to the unbelieving atheist." Carey, A History of The Oregon Constitution, 300-301 (1926). The free exercise of religion and rights of conscience, Or Const, Art I, § 2, may not relieve religious schools from providing unemployment insurance for their employees, but if the state chooses to exempt organizations from that duty by virtue of their religious character, it cannot discriminate among otherwise similar religious schools by their structural relationship with one or another form of church or religious congregation. The Court of Appeals observed:

> "It hardly needs to be said that there are vast differences in Biblical interpretations among Christian sects. Although petitioner depends on 60 to 80 Salem churches for support, the doctrine it teaches may not be coextensive with that of each of the churches. By maintaining its independence, which petitioner's administrator testified it wishes to do, petitioner, through its governing body, can develop and change its doctrine as it sees fit, without regard to whether any of its supporting churches disapprove. That is its right. By requiring a school to submit to the control of a church or affiliation of churches to receive the exemption, ORS 657.072 effectively grants the church the power to determine the school's doctrine, thereby infringing on the right of citizens to develop, independently, their own set of beliefs as well as discouraging the multiplicity of sects. That the legislature cannot do."

61 Or App at 628, 659 P2d at 422.

■ If three religious schools were subjected to significantly different taxes or other legal burdens, not by virtue of differences in their functions and operations, but because one was operated by church officials, another by persons separately appointed by a church congregation to conduct a school, and the third by persons independent of any organization describing itself as a church yet equally devoted to the teaching of "religious opinions" as that term is used in Article I, section 3, they hardly would "all" be equally "secure" to exercise their rights under that section and section 2 "according to the dictates of their own consciences." For the same reason, church affiliation cannot be made one of the "terms" on which equality may be conditioned under Article I, section 20, with respect to "privileges or immunities" that are not themselves guaranteed, as tax exemption is not.[14]

When the United States Supreme Court sustained tax exemption of the property of religious organizations, the Court noted the wide range of New York's exemption, and it wrote:

"[New York] has not singled out one particular church or religious group or even churches as such; rather, it has granted

---

[14] Judge Cooley wrote in 1878:

"The legislatures have not been left at liberty * * * to establish preferences by law in favor of any one religious persuasion or mode of worship. There is not complete religious liberty where any one sect is favored by the State and given an advantage by law over other sects. Whatever establishes a distinction against one class or sect is, to the extent to which the distinction operates unfavorably, a persecution. * * * The extent of the discrimination is not material to the principle; it is enough that it creates an inequality of right or privilege."

Cooley, Constitutional Limitations 584 (4th ed. 1878). See also Laycock, Towards a General Theory of the Religion Clauses: The Case of Church Labor Relations and the Right to Church Autonomy, 81 Colum L Rev 1373, 1412(1981). Whether a religious institution may, with respect to functions other than worship, be afforded privileges or immunities not extended to otherwise similar secular institutions is a thorny problem not presented in this case. With respect to taxation, the problem generally has been muted by the fact that many exemptions group religious with nonreligious charitable, educational, or cultural institutions. See, e.g., Paulsen, Preferment of Religious Institutions in Tax and Labor Legislation, Law & Contemp Prob 144, 150-151(1949); Bittker, Churches, Taxes and the Constitution, supra note 9, at 1291 (1969).

We have been unable to find an explanation for the origins, meaning, or purposes of the distinction made in FUTA between "churches" and other "organization[s] operated primarily for religious purposes." This and similar distinctions are questioned by students of American religious history and organizations. See e.g., Worthing, "Religion" and "Religious Institutions" under the First Amendment, 7 Pepperdine L Rev 313 (1980); Whelan, "Church" in the IRC: The Definitional Problem, 45 Fordham L Rev 885 (1977); Baker, Belief and Action: Limitations of the Free Exercise of Religion, in Church, State and Politics 40 (1981).

exemption to all houses of religious worship within a broad class of property owned by nonprofit, quasi-public corporations which include hospitals, libraries, playgrounds, scientific, professional, historical, and patriotic groups."

*Walz v. Tax Commission,* 397 US 664, 673, 90 S Ct 1409, 1413, 25 L Ed 2d 697, 703-04 (1970). Two concurring opinions stressed the same point.[15] Discrimination between religious entities organized as or by "churches" and similar entities not so organized has troubled other state courts. In a Pennsylvania case, five schools were affiliated with churches and were found to be operated primarily for religious purposes, but a sixth religious school was operated by an independent nonprofit corporation unaffiliated with any church. The court held the organizational distinction made by the statute "offensive to the free exercise clause of the first amendment." *Christian School Ass'n v. Com. Dept. of Labor,* 55 Pa Cmwlth Ct 555, 569, 423 A2d 1340, 1347 (1980). A California court avoided the dilemma by holding two organizations conducting Christian clubs, camps, and conference centers to be "churches" within the meaning of the statute. *Young Life Campaign v. Patino,* 122 Cal App 3d 559, 176 Cal Rptr 23 (1981). The Colorado Supreme Court, on the other hand, held the Young Life organization not to be a church but sustained

---

[15] "Government may properly include religious institutions among the variety of private, nonprofit groups that receive tax exemptions, for each group contributes to the diversity of association, viewpoint, and enterprise essential to a vigorous, pluralistic society. * * * To this end, New York extends its exemptions not only to religious and social service organizations but also to scientific, literary, bar, library, patriotic, and historical groups, and generally to institutions 'organized exclusively for the moral or mental improvement of men and women.' The very breadth of this scheme of exemptions negates any suggestion that the State intends to single out religious organizations for special preference."

397 US at 689, 90 S Ct at 1421, 25 L Ed 2d at 713. (Brennan, J., concurring).

"The statute also satisfies the requirement of neutrality. Neutrality in its application requires an equal protection mode of analysis. The Court must survey meticulously the circumstances of government categories to eliminate, as it were, religious gerrymanders. * * *

"* * * * *

"As long as the breadth of exemption includes groups that pursue cultural, moral or spiritual improvement in multifarious secular ways, including, I would suppose, groups whose avowed tenets may be antitheological, atheistic, or agnostic, I can see no lack of neutrality in extending the benefit of the exemption to organized religious groups."

397 US at 696, 90 S Ct at 1425, 25 L Ed 2d at 717 (Harlan, J., concurring).

the resulting discrimination between church-related and independent religious organizations as being justified by a "compelling state interest" in providing for unemployed workers. *Young Life v. Div. of Employment & Training,* 650 P2d 515 (Colo 1982). Although Colorado's constitutional guarantee of religious freedom provides: "Nor shall any preference be given by law to any religious denomination or mode of worship," Colo Const, Art II, § 4, the court declined to give this specific proscription of religious discrimination any independent meaning. *Id.* at 526.[16]

■ As our earlier discussion shows, we agree more with the Pennsylvania court's approach than with the Colorado court's. If the state chooses to oblige religious schools along with others to provide unemployment security for their employees, we believe that a court need not weigh the state's objective to determine whether, in the court's opinion, it is "compelling," nor, on the other hand, that the state may assert "compelling" interests in order to discriminate between otherwise indistinguishable religious activities by their sectarian affiliations.

## V. APPLYING ORS 657.072 TO COMPLY WITH FUTA AND CONSTITUTION

The Court of Appeals, omitting any analysis under Oregon's constitution, reached the same result under the First Amendment. 61 Or App at 629, 659 P2d at 423. It therefore necessarily held FUTA's section 3309(b)(1) unconstitutional as well as ORS 657.072(1)(a), insofar as they discriminate among organizations "operated primarily for religious purposes" by the test whether the organization also is "operated, supervised, controlled or principally supported by a church or convention or association of churches." The court then concluded that the proper remedy is to exempt the Academy from ORS chapter 657 even though it is not operated, supervised, controlled, or principally supported by a church or churches. We turn to that question.

---

[16] A decision sustaining the District of Columbia's exemption of churches and church-related organizations from unemployment taxation does not note the distinction of non-church related religious organizations, nor that *St. Martin Lutheran Church* did not decide the constitutionality of that distinction. *Konecny v. District of Columbia,* 447 A2d 31 (DC App 1982).

The Court of Appeals recognized that if it was mistaken in assessing what the Supreme Court might hold as to 26 USC § 3309(b)(1), a decision to exempt Salem Academy might jeopardize Oregon's compliance with FUTA and therefore the federal unemployment tax credits of all Oregon employers. 61 Or App at 629, 659 P2d at 423. The court continued:

"The alternative remedy of subjecting all church schools to the Act is contrary to the language of ORS 657.072(1). However, it is clear that the legislature has intended to conform Oregon's statutory scheme to FUTA. ORS 657.030(2)(b) expressly so provides. We do not know whether the Secretary of Labor will persist in his interpretation of the exemptions from FUTA involved here until the United States Supreme Court resolves the constitutional questions. Neither do we know how the Supreme Court would decide those questions nor how Congress might respond to a decision that the provision is unconstitutional under the Establishment Clause. It seems reasonably clear, however, that Congress intended to exempt church-operated schools and, accordingly, would probably expand the exemption to include religious schools like petitioner's."

61 Or App at 630, 659 P2d at 423. In effect, the court speculated on the Supreme Court or Congress to save Oregon's status under FUTA by striking the federal requirement that schools like the Academy must be affiliated with a church to avoid coverage under the act.

We do not know what view the United States Supreme Court may take of 26 USC § 3309(b)(1) under the First Amendment. The Court of Appeals may have anticipated it correctly. If the Supreme Court agrees that the distinction based on church affiliation is untenable, it will not now overcome the flaw by bringing all schools under FUTA as the Secretary of Labor argued; *St. Martin Lutheran Church v. South Dakota, supra,* has foreclosed that interpretation of FUTA, though not of state laws. The Court therefore may strike the church affiliation requirement as unconstitutional, allowing religious schools like the Academy to qualify for exemption and saving Oregon's compliance with FUTA, as the Court of Appeals suggests. But this is uncertain. The Supreme Court may find that in a statute focusing on "the nature of the *employer,*" *St. Martin Lutheran Church,* 451 US

at 783, 101 S Ct at 2149, 68 L Ed 2d at 621, a line between employment directly by a "church" and employment by a "separately incorporated" religious organization that has a "legal identity separate from a church," *id.* at 782 n.12, 101 S Ct at 2148 n.12, 68 L Ed 2d at 620 n.12, is constitutionally permissible, perhaps on the theory that the state's "entanglement" in applying the statute to such an organization stops at the separate legal entity without involving the related "church." We do not find the theory convincing when, under the statute, the separate entity itself is an organization "operated primarily for religious purposes," but we cannot exclude it.

If FUTA validly requires coverage of independent religious schools, a holding that excludes them from coverage under ORS chapter 657 would have consequences directly contrary to the legislature's dominant objective of maintaining Oregon's conformity with FUTA. In a choice between exempting independent religious schools and losing conformity with FUTA or maintaining that conformity and extending coverage to all religious schools, the legislature in 1977 surely would have chosen the latter course. In fact the legislature may well have believed that it made that choice when it repealed the previous exemption of "a school which is not an institution of higher education." Or Laws 1977, ch 446, § 4.

The Court of Appeals thought that such a holding would do violence to ORS 657.072(1), but that is not so. To the contrary, considering the repeal of the express exclusion of schools and the subsequent doubt whether religious schools that also provide the required non-religious curriculum are primarily "schools" or operated "primarily for religious purposes," it is equally possible that the legislature did not expect any schools that satisfy the state's school attendance laws to be excluded. This, as noted above, was the position taken by the United States Labor Department for some years after the Oregon legislature's 1977 session, and if the secretary's interpretation of FUTA had prevailed, we have no doubt that ORS 657.072(1) was meant to comply with it. It therefore does no violence to that section to give it the same interpretation despite the Supreme Court's later decision in *St. Martin Lutheran Church.* If the legislature prefers to risk the uncertainty of the position set out by the Court of Appeals, *supra,* and exclude all organizations operated for religious purposes,

whether or not affiliated with churches, our decision leaves it the opportunity to do so. Meanwhile our decision leaves no doubt that Oregon's unemployment compensation law complies both with FUTA and with Oregon's constitution.

## VI. CONCLUSION

In summary, we reach the following conclusions.

■ The legislature could not constitutionally exclude from unemployment compensation coverage religious schools and their employees if they are controlled or principally supported by organizations described as "churches" and extend coverage to otherwise similar religious schools operated by religious organizations that are not "churches." The distinction contravenes the equality among pluralistic faiths and kinds of religious organizations embodied in the Oregon Constitution's guarantees of religious freedom.

■ When the legislature enacted present ORS 657.072(1)(a), it intended to assure that Oregon's unemployment compensation law would continue to comply with FUTA. The legislature had no assurance that, with the repeal of the express exclusion of schools, FUTA would allow exclusion of schools of any kind. The federal Department of Labor in fact interpreted the amended FUTA to require coverage of all schools below the level of higher education, and ORS 657.072(1)(a) in 1977 doubtless was meant to provide that coverage if the department's view had prevailed. ORS 657.072(1)(a) therefore did not and does not exclude religious schools of any kind, although the Labor Department's view of FUTA later was rejected by the United States Supreme Court.

ORS 657.072(1)(a) does not infringe on the Academy's constitutional right if it extends to all schools. If, upon examination of the state and federal law, the legislature chooses to exempt all religious schools, including the Academy, from providing unemployment compensation coverage for their employees, the legislature has the opportunity to do so. The present decision concludes that the 1977 legislature would not have taken the risk of jeopardizing Oregon's compliance with FUTA when it repealed the exclusion of schools and enacted the present version of ORS 657.072(1)(a), and that therefore it did not exempt all religious schools and their employees from unemployment compensation coverage.

For the foregoing reasons the decision of the Court of Appeals is reversed and the Employment Division's decision is reinstated.