255

Argued and submitted April 21, reversed and remanded December 6, 2000

Joni NICHOLS,
*Petitioner,*

*v.*

OFFICE OF MEDICAL ASSISTANCE PROGRAMS,
*Respondent.*

(AG5482 (Control), 4-2617-AG5482;
CA A102966 (Control), A102967)
(Cases Consolidated)

15 P3d 578

Karen Berkowitz argued the cause for petitioner. With her on the briefs were Julia Olsen and Legal Aid Services of Oregon.

Judy C. Lucas, Assistant Attorney General, argued the cause for respondent. With her on the brief were Hardy Myers, Attorney General, and Michael D. Reynolds, Solicitor General.

Before Edmonds, Presiding Judge, and Deits, Chief Judge, and Armstrong, Judge.

EDMONDS, P. J.

## EDMONDS, P. J.

Petitioner is an incomplete quadriplegic as the result of a progressive spinal cord disease. She receives medical benefits from the Oregon Health Plan (OHP) through Regence HMO (Regence), a health maintenance organization that has a contract with the OHP. Because of her condition, petitioner spends long periods of time in bed, which among other things makes her susceptible to decubitus ulcers, commonly called "bed sores." Petitioner seeks review of final orders of the Office of Medical Assistance Programs (OMAP) in two cases in which OMAP determined that Regence's decisions to change the bed and mattresses that it provided were not "actions" that entitle her to prior notice and a hearing under the applicable state and federal rules.[1] We reverse and remand.

We state the facts as OMAP found them, supplemented by other evidence in the record on which there does not appear to be any dispute. In 1996, petitioner developed a decubitus ulcer on her coccyx that grew progressively worse despite treatment. In March 1997, her physicians recommended a Synergy Dynamic bed, which is an air flotation bed with 16 adjustable sections that can be programmed to adjust pressure and to rotate the patient at regular intervals. Under OAR 410-122-0400, the Synergy Dynamic is a category E0193 bed, which is a group 2 pressure reducing support surface.[2] Petitioner's ulcer, along with her general comfort and ability to sleep, improved with her use of that bed. On June 18, 1997, Regence replaced the Synergy Dynamic bed with a TriCell air-powered pressure reducing mattress. As the name implies, the TriCell mattress has three manually adjustable air-filled cells and is a category E0277 mattress. Although it

---

[1] OMAP issued three orders in each case, the second being a reconsideration of the first and the third a reconsideration of the second. With exceptions that are not relevant on review, the findings and conclusions in the later orders were consistent with and either restated or incorporated the findings and conclusions in the earlier orders. Thus, we will consider statements in all of the orders, although we formally review only the third order.

[2] For convenience, we will henceforth refer to the bed and mattresses involved in this case as "surfaces" rather than "pressure reducing support surfaces." In general, category 2 surfaces provide more effective pressure reducing support than do category 1 surfaces.

lacks the 16 adjustable sections and programmable feature of the Synergy Dynamic bed, it also is classified as a category 2 surface. According to petitioner, the TriCell mattress did not provide her with the same level of comfort and ability to sleep as did the Synergy Dynamic. Nevertheless, her ulcer continued to improve while she used it. On October 28, 1997, Regence notified petitioner that it would replace the TriCell mattress with a GeoMatt mattress at the end of November. The GeoMatt is a category E0199 mattress and a group 1 surface. Petitioner was using a GeoMatt mattress when she developed the ulcer, and she believes that the GeoMatt mattress helped to cause it.

Petitioner sought hearings under the applicable administrative rules in which she sought to challenge each of these changes in surfaces.[3] However, in the orders that are presently on judicial review OMAP held that each change was not an "action" on which petitioner had a right to a hearing. The orders therefore dismissed the requests for hearing. The issue in this case is whether OMAP correctly concluded that petitioner did not have a right to a hearing and correctly refused to reach the merits of her arguments about the changes in surfaces.

■ Deciding the issue requires examining the relevant state and federal rules. The Oregon administrative rules that establish petitioner's right to a hearing are designed to comply with federal regulations that describe what is necessary for the state to qualify for participation in the Medicaid program. In the orders in these cases, OMAP stated that it construes its own rules as providing for a hearing whenever federal Medicaid law requires one. We will do the same, and therefore we focus primarily on petitioner's right to a hearing under federal law. *See Don't Waste Oregon Com. v. Energy Facility Siting*, 320 Or 132, 142, 881 P2d 119 (1994) (a court cannot overrule an agency's interpretation of its own rule if the interpretation is plausible and not inconsistent with wording of the rule or another principle of law); *see also Salem College & Academy, Inc. v. Emp. Div.*, 298 Or 471, 476-78, 494-95, 695 P2d 25 (1985) (a state law designed to meet

---

[3] Regence permitted petitioner to keep the TriCell mattress pending the outcome of the hearing. So far as the record indicates, she continues to use it.

federal standards will ordinarily be interpreted to comply with requirements of the federal program); *Rubio v. Employment Div.*, 66 Or App 525, 674 P2d 1201 (1984) (construing state unemployment compensation statute to be consistent with federal requirements).

■      OAR 410-141-0000(1) defines an "Administrative Hearing" as a "hearing related to a denial, reduction, or termination of benefits[.]" OAR 410-141-0264 provides that the hearings will be governed by OAR 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 *et seq.*, which regulate hearings that the Adult and Family Services Division conducts. Those provisions are consistent with the federal rules. 42 CFR § 431.206(2) requires a hearing "[a]t the time of any action" affecting a beneficiary's claim. 42 CFR § 431.201 defines "action" as "a termination, suspension, or reduction of Medicaid eligibility or covered services." Thus, the first question is whether the Synergy Dynamic bed and the TriCell mattress are Medicaid "covered services." Under 42 CFR § 440.70(b)(3), covered home health services include "[m]edical supplies, equipment, and appliances suitable for use in the home." The applicable dictionary definitions of "equipment" include "the physical resources serving to equip a person or thing" and "a piece of such equipment." *Webster's Third New Int'l Dictionary*, 768 (unabridged ed 1993). The Synergy Dynamic bed and the TriCell mattress are physical resources serving to equip petitioner for her daily living. They are thus "equipment * * * suitable for use in [her] home," within the meaning of "home health services." Because the surfaces are in themselves Medicaid covered services, there was an "action" if either change constituted a "reduction" of those services. When an "action" occurs, there is an entitlement to a hearing under the rules.

OMAP concluded, however, that the changes were not a "reduction" of services because a change in surfaces was not a change in "services." Rather, it reasoned that the "decision to provide [petitioner] with one mattress to replace another was not a termination, suspension, or reduction of Medicaid eligibility or covered services - it was a change in treatment modality." It explained its reasoning by describing what it believed to be the potentially absurd results of concluding otherwise:

"[I]f the change of mattresses were *an action*, so would a decision to change medication dosage or a doctor-ordered removal of a cast. If claimant were correct in her assertion that she could contest the mattress exchange in a contested case hearing with the attendant right to keep the first mattress while the issue is resolved, then it would follow that OHP clients could delay physician-ordered changes in drug prescriptions, cast removals, wheel chair upgrades, *etc.*, by requesting a hearing, and OMAP and its contractors would be required to provide 10-day advance notices in every case in which a doctor or other provider orders a change in treatment. Additionally, a client would be entitled to continue using a prescribed drug that is no longer safe or appropriate."

OMAP's resort to a parade of presumed horribles by analogy does not constitute an interpretation of the language of the applicable rules. Apparently, OMAP did not consider that, in the text and the context of the rules, the providing of medical equipment for use in the home is in itself the providing of home health services and is a category of service separate from other categories, such as physician's services. *See* 42 CFR § 440.50. OMAP's reasoning is also inconsistent with the few relevant federal cases. In *Perry v. Chen*, 985 F Supp 1197 (D Ariz 1996), the court held that denying one claimant dentures, terminating another's speech therapy, and terminating a third's authorization for disposable adult diapers were "actions" that required prior notice and a hearing. Dentures are a medical appliance,[4] while adult diapers are medical supplies; like equipment, each is part of home health services under 42 CFR § 440.70(a)(3).[5] In *Catanzano by Catanzano v. Dowling*, 60 F3d 113 (2nd Cir 1995), the court held that the reduction of home health services from 24 hours a day to 12 hours was an "action" under the rules. Finally, in *Ladd v. Thomas*, 962 F Supp 284 (D Conn 1997), the court held that the federal rules required a state agency to give prior notice and a right to a hearing before denying a request

---

[1] *Stedman's Medical Dictionary*, 103 (23rd ed 1976).

[5] The primary issue in *Perry* was whether the decisions of providers with whom the state contracted were state actions so that the federal rules applied. The court held that they were. There was no real dispute about whether the patients were entitled to notice and a hearing if the decisions were state action.

for durable medical equipment.[6] As those cases suggest, to the extent that OMAP relied on its conclusion that a change of surfaces cannot be a reduction of services, its conclusion is contrary to the language of 42 CFR § 431.70(b)(3).

OMAP also determined that the change from the Synergy Dynamic bed to the TriCell mattress was not a reduction in services because both are group 2 surfaces. It thus treated all group 2 surfaces as equivalent in the providing of services. It is not entirely clear whether OMAP intended that conclusion to be one of fact or one of law. To the extent that the conclusion was one of fact, OMAP has not adequately explained it. OMAP relied solely on OAR 441-122-0400, which both describes group 1 and group 2 surfaces and contains the requirements that a patient must meet in order to be eligible for each category of surface. OMAP did not attempt to evaluate the evidence in the record concerning the Synergy Dynamic bed and the TriCell mattress or to compare their specific characteristics, nor did it consider that group 2 includes several distinct classes of surfaces. A factfinder could determine on this record that the different surfaces within Group 2 provide different kinds and levels of services, but OMAP has not addressed the issues necessary to resolve that question.

■ OMAP's reasoning thus does not meet the substantial reason test. *See Drew v. PSRB*, 322 Or 491, 500, 909 P2d 1211 (1996). It does not necessarily follow that, because two kinds of equipment fit into the same general category, they render physically or therapeutically equivalent services to the beneficiary. The evidence about the Synergy Dynamic bed and TriCell mattress indicates that the two surfaces may be significantly different. Also, the fact that petitioner's treatment began with the Synergy Dynamic bed and that she was changed to the TriCell mattress after her ulcer began to

---

[6] OMAP argues that the *Ladd* opinion does not describe the nature of the durable medical equipment involved. Because the case was a class action, it necessarily covered a wide variety of equipment, but the court did refer to a wheelchair in giving an example of how the state agency handled requests for equipment. 962 F Supp at 291 n 4. OMAP does not argue that a bed or mattress is not "equipment" under the rule, so the precise nature of the equipment in *Ladd* is not significant to its applicability to this case.

improve could suggest that the bed is considered the superior surface for the treatment of decubitus ulcers. That suggestion, along with other evidence in the record, could support a conclusion that changing the surfaces was a "reduction" of home health services within the meaning of the rule.

OMAP also argues that, as a matter of law, it has construed the meaning of its rules and that that construction is plausible and therefore controlling under *Don't Waste Oregon*. However, under OAR 410-122-0400, Group 2 consists of five distinct categories of surface: E0193 powered air flotation bed; E0277 powered pressure-reducing mattress, air; E0371 nonpowered advanced pressure-reducing overlay for mattress; E0372 powered air overlay for mattress; and E0373 nonpowered advanced pressure-reducing mattress. In addition, the rule contains the criteria that a patient must meet to be eligible for a Group 2 surface; under those criteria, a patient may become eligible in several different ways. In light of the variables involved in the rule itself, of OMAP's failure to consider them, and of the rule's greater focus on eligibility for a Group 2 surface than on the distinction among surfaces, we cannot say that its construction of the rule, that all Group 2 surfaces are equivalent, is plausible.

■ In summary, we conclude that the surfaces involved in these cases are medical equipment, that the providing of them constitutes home health services under the applicable rules, and that petitioner is entitled to notice and a hearing before any "reduction" in the services that that equipment represents can occur. Whether a "reduction" of services occurred is a question of fact that the agency must decide unless it can resolve the question as a matter of law by a plausible interpretation of the rule. At this point, OMAP has not found sufficient supportable facts or provided an adequate rationale to support its ultimate finding that the changes are not reductions in services. We therefore reverse OMAP's decisions and remand the cases to it for reconsideration.[7]

Reversed and remanded.

---

[7] In its last assignment of error, petitioner attacks one of OMAP's factual findings. In light of our reversal of the decisions, we do not consider that assignment. On remand, OMAP will make new factual findings that are appropriate to the issues that will now be before it.