Argued and submitted January 5, affirmed on petition; reversed in part on cross-petition and remanded June 2, both petitions for review allowed October 26, 1999
(329 Or 447)
See later issue Oregon Reports

# NEWPORT CHURCH OF THE NAZARENE,
an Oregon nonprofit corporation,
*Petitioner,*

*v.*

# Gordon R. HENSLEY,
*Respondent - Cross-Petitioner,*
*and*

# EMPLOYMENT DEPARTMENT,
*Respondent - Cross-Respondent.*

## (EAB No. 97-AB-2014; CA A99663)

983 P2d 1072

Kelly E. Ford argued the cause and filed the briefs for petitioner. With her on the briefs were Kelly E. Ford, P.C., and Gregory S. Baylor, Annandale, Virginia.

Paul R. Meyer argued the cause for respondent - cross-petitioner. With him on the brief were Charles F. Hinkle and ACLU Foundation of Oregon, Inc.

Christine Chute, Assistant Attorney General, argued the cause for respondent - cross-respondent. With her on the brief were Hardy Myers, Attorney General, and Michael D. Reynolds, Solicitor General.

Before De Muniz, Presiding Judge, and Haselton and Armstrong, Judges.

DE MUNIZ, P. J.

## DE MUNIZ, P. J.

In this unemployment compensation claim case, petitioner, the Newport Church of the Nazarene (Church), challenges an award of benefits to claimant. ORS 657.282. Claimant cross-petitions for review of the denial of attorney fees, the failure to admit certain evidence related to the attorney fee issue and the failure to award interest on his benefits. On review for errors of law, we affirm on the petition and affirm in part and reverse in part on the cross-petition and remand. ORS 183.482(8)(a).

We state the facts as contained in the administrative record. In October 1993, claimant began work for Church as a youth minister. Approximately eight months later, Church discharged claimant because, according to his supervisor, claimant "disrupted the cohesiveness of [Church's] staff and support of the congregation was decreasing significantly." In September 1994, claimant filed a claim for unemployment compensation benefits. The filing of that claim commenced a lengthy process in which Church argued that constitutional guarantees of religious freedom prohibited the state from including claimant, a minister, in the unemployment compensation system. After several intervening administrative decisions and orders, the Employment Appeals Board (Board) ultimately affirmed a reconsidered administrative decision awarding claimant benefits. This petition for review followed from that decision.

In light of Church's constitutional challenge, which does not concern any benefit eligibility determinations made on nonconstitutional grounds, some background on Oregon's unemployment compensation law, ORS chapter 657, is necessary to a proper understanding of this case. When a claimant applies for unemployment compensation benefits, the Employment Department (Department) "shall" examine each claim and make a decision to allow or deny the claim. ORS 657.266; ORS 657.267. In making that determination, the Department first decides whether the claimant has worked for an employer subject to ORS chapter 657 and, if so, whether the claimant has earned enough wages during the base year to qualify for benefits. ORS 657.150; *see also* ORS

657.105 to ORS 657.140 (defining "subject employment" and wages). If the Department determines that a claimant has not worked for a subject employer or has not earned enough wages, then the claimant's claim is denied and the inquiry ends. If, however, a claimant meets those work and wage requirements, the Department "shall" determine if the claimant is otherwise disqualified for one of several statutory reasons. ORS 657.176. Some of the disqualifying factors include work separation for misconduct, voluntary separation without good cause and absence or tardiness from work as a result of alcohol or drug use. ORS 657.176; *see also* OAR 471-030-0038(3)(a) (discussing factors that constitute misconduct). After an administrative decision is made with respect to either work and wage requirements or disqualifying factors, either party may request a hearing, a Board decision, and ultimately review by this court. Here, the dispute centers on whether ministerial work is a "subject employment."[1]

■      ORS 657.072(1)(a) and (b) exclude from "subject employment" services performed for a church and services performed by a minister of a church.[2] The provisions intentionally mirror the corresponding federal statute, the Federal Unemployment Tax Act (FUTA), 26 USC section 3309(1)(b) (1988), to ensure that Oregon employers receive a significant tax benefit.[3] *Employment Div. v. Rogue Valley Youth for*

---

[1] We note that, after the Board's first decision, which occurred early in the process, and in which the Board determined that claimant had submitted a valid claim for benefits for work in subject employment, the Department conducted a disqualification inquiry. ORS 657.176. The Board determined that claimant was "discharged but not for misconduct connected with [claimant's] work." Church did not challenge that determination.

[2] ORS 657.072 provides, in part:

"(1) 'Employment' does not include service performed:

"(a) In the employ of:

"(A) A church or convention or association of churches;

"(B) An organization which is operated primarily for religious purposes and which is operated, supervised, controlled or principally supported by a church or convention or association of churches;

"(b) By a duly ordained, commissioned or licensed minister of a church[.]"

[3] FUTA created a cooperative federal-state scheme to provide benefits to unemployed workers. Under the scheme, FUTA impels states to adopt adequate unemployment insurance programs by offering states a 90 percent tax offset for any "payments a state might exact for a state unemployment compensation program that me[ets] prescribed federal standards." *Salem College & Academy,*

*Christ*, 307 Or 490, 493-97, 770 P2d 588 (1989); *Salem College & Academy, Inc. v. Emp. Div.*, 298 Or 471, 495, 695 P2d 25 (1985).

Before claimant initially filed his claim, the Supreme Court had decided two cases involving the constitutionality of ORS 657.072(1)(a) in light of the Oregon Constitution's guarantees of religious freedom and the interplay of those constitutional provisions with the tax benefits that resulted from compliance with FUTA. *See Salem College*, 298 Or 471 (involving religious schools); *Rogue Valley*, 307 Or 490 (involving religious organizations). In each case, the court held that, in limiting the exemption from the unemployment system to "churches," as opposed to all religious organizations, section (1)(a) of ORS 657.072 violated the principle of "equality among pluralistic faiths * * * embodied in the Oregon Constitution's guarantees of religious freedom[,]" *Salem College*, 298 Or at 495,[4] which requires the state to treat all religious organizations similarly. *Id.* at 484-92; *Rogue Valley*, 307 Or at 496-97. Given that constitutional holding, the court in each case then determined whether, in treating all religious organizations similarly, the legislature would have intended to subject all religious organizations to, or exclude all from, the unemployment tax. Ultimately, the court held that all such organizations were subject to unemployment taxation, a decision driven by the relationship

---

*Inc. v. Emp. Div.*, 298 Or 471, 476, 695 P2d 25 (1985). Compliance with FUTA is optional but requires that state coverage at least mirror federal coverage—*i.e.*, states cannot exempt more workers from the system than are exempt under FUTA—to ensure the tax offset. *Id.*

[4] In *Salem College*, 298 Or at 488-89, the court relied on the following provisions of the Oregon Constitution:

Article I, section 2:

"All men shall be secure in the Natural right, to worship Almighty God according to the dictates of their own consciences."

Article I, section 3:

"No law shall in any case whatever control the free exercise, and enjoyment of religeous (*sic*) opinions, or interfere with the rights of conscience."

Article I, section 20:

"No law shall be passed granting to any citizen or class of citizens privileges, or immunities, which, upon the same terms, shall not equally belong to all citizens."

between Oregon's unemployment compensation system and FUTA and the attendant desire to retain Oregon's unemployment tax credit. *See Salem College*, 298 Or at 492-95 (applying ORS 657.072 in a manner that complied with FUTA and the Oregon Constitution); *see also Rogue Valley*, 307 Or at 496-97 (same). In contrast to those cases, the dispute here focuses on ORS 657.072(1)(b), the so-called ministerial exemption.

More background is required. Before claimant filed his claim, and in an effort to comply with the equality requirements announced in *Salem College* and *Rogue Valley*, the Department promulgated OAR 471-31-090(1) (1989),[5] which interpreted and broadened the ministerial exemption in ORS 657.072(1)(b) to include ministers licensed by "religious organization[s]." As claimant's claim moved through the administrative process, however, the United States Department of Labor informed the Department that Oregon's ministerial exemption, as defined by OAR 471-31-090(1)(a) (1989), was too broad because it exempted ministers who have been licensed or ordained by churches *and religious organizations*, while FUTA limited that exemption to ministers licensed only by churches. *See* USC § 3309(1)(b) (1988). Consequently, that rule put Oregon out of compliance with FUTA. Because noncompliance meant the potential loss of the desired tax credit for employers in Oregon, the Department responded by promulgating a new rule that tacitly declared ORS 657.072(1)(b) unconstitutional as it trumped the exemptions contained therein and included all ministers within mandatory unemployment coverage. OAR 471-031-0090 (1996).[6] In an administrative decision on

---

[5] OAR 471-31-090(1) (1989) provided:

"(1) As used in ORS 657.072 and this rule:

"(a) An 'ordained, commissioned or licensed minister' is one who is vested with ministerial status in accordance with the procedure followed by a particular church or *religious organization*." (Emphasis added.)

[6] From this point forward, we will refer to the 1996 version of OAR 471-031-0090, which provides:

"Notwithstanding ORS 657.072, the term 'employment' as used in ORS chapter 657 includes service performed in the employ of a church or other nonprofit religious organization including service performed by a minister of a church or by a member of a religious order."

reconsideration, the Department awarded benefits to claimant on the basis of that rule.[7]

Both Church and claimant requested a hearing on that decision, Church seeking reversal of the decision awarding claimant benefits in the first place and claimant seeking a reversal of the denial of attorney fees. The Department and the Board affirmed the decision on reconsideration in all respects.

In its first assignment of error, Church contends that the ministerial exemption contained in ORS 657.072(1)(b) is constitutional and, therefore, that the Department acted beyond its authority in promulgating the related administrative rule subjecting all ministers to the unemployment compensation law. Given our ultimate holding that the rule survives Church's First Amendment challenge, we further note that there is no dispute over the Department's authority to promulgate a rule in the face of an unconstitutional statute. *See* ORS 657.610(4) (the Department may "[d]etermine all questions of general policy and promulgate rules and regulations"). The exemption in ORS 657.072(1)(b) provides:

> "(1)  'Employment' does not include service performed:
>
> "* * * * *
>
> "(b)  By a duly ordained, commissioned or licensed minister of a *church*[.]" (Emphasis added.)

Because the exemption is limited to ministers who receive their authority from a "church," Church's argument, like the essential issue in both *Salem College* and *Rogue Valley*, turns on the use of the word "church" as a word of art.[8]

■    As the court in *Rogue Valley* explained:

> "The core problem involves the definition of the word 'church.' Defining 'church' too narrowly—including, for example, only hierarchical churches such as the Roman

---

[7] At that procedural juncture, Church moved to reopen the record to introduce evidence of misconduct, but that motion was denied based on the earlier and unchallenged administrative decision settling that question.

[8] Indeed, at oral argument, counsel for Church stated that "there is no such thing as a non-church minister."

Catholic Church—might comply with FUTA, but it would violate the Oregon Constitution because the protections of the Oregon Constitution extend to worship even outside organized churches. *Salem College*[,] 298 Or at 495. On the other hand, if 'church' is defined too broadly, organizations would be exempted from the unemployment tax when FUTA requires that they be included." 307 Or at 496.

In basing the exemption from coverage on a minister's licensing body—*i.e.*, on whether a minister's authority comes from a "church"—section (1)(b), like section (1)(a), draws its taxation line on the side of churches, a distinction that, in *Salem College* and *Rogue Valley*, violated the constitutional rule that "Oregon must treat all religious organizations similarly whether or not they would qualify as churches[.]" *Rogue Valley*, 307 Or at 497. We conclude that the same principle controls here and therefore hold that section (1)(b), like section (1)(a), unconstitutionally distinguishes between churches and other religious organizations. *Salem College*, 298 Or at 484-92; *Rogue Valley*, 307 Or at 496-97.

In an attempt to distinguish the question here from the issue in *Salem College* and *Rogue Valley*, Church argues:

"The phrase 'minister of a church' simply states a commonly recognized credentialling requirement to qualify as a bona fide minister, [unlike section (1)(a)] it does not limit exempt employment to ministerial work performed for churches. Ministerial work performed for all nongovernmental employers, including religious organizations of all types and even secular employers, is exempt. In that respect, subsection (1)(b) is quite different from subsection (1)(a), * * * because of the distinction subsection (1)(a) draws between employment by churches and their affiliates (exempt) and employment by unaffiliated religious organizations (subject)."

Church's arguments are unavailing because the observation that subsection (1)(b) focuses on a minister's function, rather than a minister's employer, although true in part, is beside the point. It is the distinction based on licensing by a "church" that matters; and that question has been decided adversely to Church's position by the Oregon Supreme Court. We therefore reject Church's first assignment of error.

In Church's second assignment of error, it argues that OAR 471-031-0090, which the Department promulgated to override ORS 657.072(1)(b), and which includes ministerial employment within the unemployment compensation system, offends the First Amendment to the United States Constitution.[9] Church's basic assertion is that constitutional guarantees of religious liberty prohibit the state from making any inquiry into the reasons behind the discharge of a minister, which, as noted, is an inquiry that must occur after a claim is filed. ORS 657.176.

■ Claimant argues first that Church failed properly to preserve that issue at the hearing and review level because it did not challenge the misconduct determination made by the Department. Based on that assertion, claimant contends that Church has "waived" its First Amendment argument. We disagree with claimant.

Here, Church is not seeking a review of the misconduct determination; rather, it is challenging the constitutional validity of "the very existence of [the disqualification] inquiry." In other words, Church asserts a facial challenge to OAR 471-031-0090, which includes ministers within unemployment coverage, and which, in turn, necessarily subjects religious employers to the disqualification inquiry. Furthermore, in this case, such an inquiry did, in fact, occur; and, from the beginning of the administrative review process, Church challenged on First Amendment grounds the inclusion of ministers in the unemployment compensation system based primarily on the constitutional problems it perceived to be associated with that inquiry. Because Church's constitutional challenge relates to the necessary occurrence of the inquiry and not to its result, and because Church raised that issue at the hearing and review level, its argument is properly before us.

■■ Before addressing the merits of Church's facial challenge, we consider an additional preliminary matter. Consistent with the principle that we must "construe statutes to be

---

[9] The First Amendment to the United States Constitution provides:

"Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof [.]"

constitutional, if that can be done[,]" *State v. Charlesworth / Parks*, 151 Or App 100, 107, 951 P2d 153 (1997), *rev den* 327 Or 82 (1998), before invalidating a textually overbroad statute, we must first determine whether the law may be applied constitutionally, leaving only marginal instances of potentially unconstitutional application to case-by-case decision. *Cooper v. Eugene Sch. Dist. No. 4J*, 301 Or 358, 378, 723 P2d 298 (1986), *appeal dismissed* 480 US 942 (1987). Here, claimant and the Department argue from the premise that the First Amendment prohibits only state inquiries into matters concerning a religious organization's doctrine. From that assertion, they urge that there are situations in which a minister's discharge would not involve doctrinal matters, and, thus, the Department would not have to inquire about the validity of a religious organization's doctrine as it applied to the discharge. Therefore, they argue, the rule could be applied constitutionally, and Church's facial challenge must fail. We disagree because, as we discuss below, that argument misconstrues Church's argument and the case law supporting it.

To reiterate, Church is not challenging the *result* of the disqualification inquiry; it is the "very existence of that inquiry" that troubles Church, and, as noted, that inquiry always must occur with the filing of any claim for compensation. ORS 657.176; *see, e.g., NLRB v. Catholic Bishop of Chicago*, 440 US 490, 502, 99 S Ct 1313, 59 L Ed 2d 533, 542 (1979) (holding that "[i]t is not only the conclusions that may be reached by the Board which may impinge on rights guaranteed by the Religion Clauses, but the very process of inquiry leading to findings and conclusions"). In that light, every ministerial discharge and related claim for benefits raises the constitutional question posed by Church.

We now turn to the merits. The Department attempts to cast Church's argument as one based on the Establishment Clause, because Church used in its argument the word "entanglement." *See Lemon v. Kurtzman*, 403 US 602, 612-13, 91 S Ct 2105, 29 L Ed 2d 745 (1971) (specifying "excessive entanglement" as one of three criteria in the Establishment Clause analysis). Church counters, arguing that this case is governed by a unique doctrine that "protects church autonomy independently of the 'tests' formulated to

analyze discrete claims under the Establishment and Free Exercise Clauses." *See Serbian Orthodox Diocese v. Milivojevich*, 426 US 696, 96 S Ct 2372, 49 L Ed 2d 151 (1976) (discussing the right to church autonomy and basing its decision on that right). We disagree with both the Department and Church.

Essentially, Church's argument concerns its right to decide, free from state intervention, whether a spiritual leader adequately performed the ministerial function. That right derives from the more general right of church autonomy, a principle first recognized by the United States Supreme Court in *Watson v. Jones*, 80 US 679, 13 Wall 679, 20 L Ed 666 (1871). In *Serbian Orthodox Diocese*, the Court discussed the historical development of that right, which, as explained by the Court, evolved from a series of cases involving the interposition of secular judgment into matters of purely ecclesiastical cognizance and polity—*e.g.*, a theological controversy or a dispute over internal church governance. 426 US at 708-12.

In that case, a religious organization defrocked one of its bishops as part of a major restructuring of its operations. The bishop filed suit in state court seeking to enjoin that act, and, ultimately, the state supreme court ruled in the bishop's favor, concluding that the organization's decision was "arbitrary" because it failed to comply with the church's own rules and regulations. *Id.* at 698-708. Without identifying precisely the Religion Clause on which it based its decision, the Court reversed the state supreme court, holding that, under the First and Fourteenth Amendments, when religious organizations create ecclesiastical tribunals to resolve ecclesiastical disputes, the decisions from those bodies, whether arbitrary or not, are beyond secular review. *Id.* at 724; *accord Bell v. Presbyterian Church (U.S.A.)*, 126 F3d 328 (4th Cir 1997).

Several federal courts of appeal have applied that principle to cases concerning the applicability of certain federal employment discrimination statutes to a church's decision to hire or fire a minister. *See, e.g., Young v. N. Ill. Conf. of United Methodist Church*, 21 F3d 184 (7th Cir 1994) (a discharge allegedly in violation of Title VII of the Civil Rights

Act); *Minker v. Baltimore Annual Conf. of United Methodist Church*, 894 F2d 1354 (DC Cir 1990) (a failure to hire allegedly in violation of Age Discrimination in Employment Act); *Rayburn v. General Conf. of Seventh-Day Adventists*, 772 F2d 1164 (4th Cir 1985) (a failure to hire allegedly in violation of Title VII of Civil Rights Act). Those courts characterized a church's right to autonomy in the context of ministerial employment decisions as flowing specifically from the protections embodied in the Free Exercise Clause and analyzed the claims accordingly. *Young*, 21 F3d at 187; *Minker*, 894 F2d at 1357; *Rayburn*, 772 F2d at 1168. For the reasons that follow, we agree and adopt that analytical approach here.

The unfettered ability to choose and control a minister goes to the heart of a religious organization's ability freely to practice its faith. That is so because a minister is the living symbol of a religious group's doctrine and, as such, exercises its faith with each ministerial act. Accordingly, it is the guarantee embodied in the Free Exercise Clause, not the Establishment Clause, that protects the interest at stake in this instance: a church's right freely to choose and regulate its leaders. *See generally* Douglas Laycock, *Towards a General Theory of the Religion Clauses: The Case of Church Labor Relations and the Right to Church Autonomy*, 81 Col L Rev 1373 (1981).

■ In *Rogue Valley*, the Oregon Supreme Court applied the current First Amendment Free Exercise Clause analysis of the United States Supreme Court, 307 Or at 498, and considered whether "requiring [religious organizations] to submit to the unemployment payroll tax and all its attendant regulation would excessively burden the free exercise of religion." *Id.* Explaining that analysis, the court noted that "it must first be shown that the governmental action imposes a burden on the party's religion." *Id.* (citing *United States v. Lee*, 455 US 252, 256-57, 102 S Ct 1051, 71 L Ed 2d 127, (1982)). If such a burden exists, " '[t]he state may justify a limitation on religion by showing that it is essential to accomplish an overriding governmental interest[,]' " *id.* (citing *Lee*, 455 US at 257), recognizing that "only those interests of the highest order * * * can overbalance legitimate claims to the free exercise of religion." *Wisconsin v. Yoder*, 406 US 205, 215, 92 S Ct 1526, 32 L Ed 2d 15 (1972). Ultimately, in *Rogue*

*Valley*, the court held that the requirement that a religious organization submit to the unemployment payroll tax and all its attendant regulation did not excessively burden the free exercise of religion.[10] 307 Or at 498.

With that analytical framework in mind, and because the free exercise question in *Rogue Valley* was different from the one here, we turn to the Fourth Circuit's analysis in *Rayburn* to better understand the application of the free exercise analysis in the context of a ministerial personnel decision. *Rayburn* is instructive because the underlying circumstances in that case are similar, though not identical, to this case and because the court thoroughly explained the considerations attendant to each analytical step.

In *Rayburn*, a church denied a pastoral appointment to a woman, and she challenged that decision on racial and sexual discrimination grounds under Title VII of the Civil Rights Act. As to the first factor under the free exercise analysis and in light of the principle from *Serbian Orthodox*, the court held that the appointment of ministers was a uniquely ecclesiastical decision and therefore, that *"[a]ny attempt by government to restrict a church's free choice of its leaders * * * constitutes a burden on the church's free exercise rights." Rayburn*, 772 F2d at 1168 (emphasis added).

As to the second analytical factor, the court identified the important state interest as "assuring equal employment opportunities for all." *Id.* Given the competing and compelling interests, the court then examined "the decisive criterion developed by the Court in *Wisconsin v. Yoder* to resolve a free exercise question: a balancing of the burden on free exercise against the 'impediment to * * * [the state's]

---

[10] We note that, in *Employment Division v. Smith*, 494 US 872, 110 S Ct 1595, 108 L Ed 2d 876 (1990), the United States Supreme Court considered the applicability of the free exercise balancing test to challenges to religion-neutral generally applicable laws that have the effect of burdening a particular religious practice. Ultimately, the Court held that "the [balancing] test [was] inapplicable to such challenges." *Id.* at 885. In this case, neither party cites or relies on *Smith*, and we do not consider its application here. *See EEOC v. Catholic University of America*, 83 F3d 455, 460-63 (DC Cir 1996) (concluding that *Smith* does not extend to cases involving church autonomy because the related burden on free exercise "is of a fundamentally different character from that issue in *Smith*[,]" and because it is unreasonable to conclude that the "Supreme Court in *Smith* intended to qualify th[e] century-old affirmation of a church's sovereignty over its own affairs").

objectives that would flow from recognizing the claimed * * * exemption.' " *Id.* (internal citations omitted; brackets and ellipses in original). The court described the nature of that inquiry as requiring that the court "distinguish incidental burdens on free exercise in the service of a compelling state interest from burdens where the *'inroad on religious liberty'* is too substantial to be permissible." *Id.* at 1169 (internal citation omitted; emphasis added). In applying the last analytical factor, the court held that the application of Title VII to the appointment of religious leaders was excessive because it would directly impose on a church's pastoral selection process additional government standards regarding the appropriate characteristics of ministers. *Id.*

In sum, *Serbian Orthodox* and its progeny stand for the principle that the application of federal employment laws to the hiring and firing of ministers constitutes an excessive burden on religious freedom that outweighs the important state interest of prohibiting discrimination in employment. *Accord Rayburn,* 772 F2d at 1169; *Young,* 21 F3d at 185-87.

Turning to the present question, the first factor involves the narrow determination whether OAR 471-031-0090 in some manner *restricts* Church's free choice and control of its leaders. *See Rayburn,* 772 F2d at 1168 (phrasing the first factor analysis as a determination whether the state has restricted a church's ability to choose its leaders). Church does not provide an answer to that question. The Department suggests that because, under the unemployment compensation law, the Department "has no authority to undermine" a ministerial employment decision, the "coercive effect of inclusion in the unemployment program, if it exists at all, is minimal and amounts only to a finite economic effect (a possible increase in a payroll tax rate or reimbursement for benefits paid)." We agree with the Department's suggestion that, in this context, the restriction on Church's free choice and control of its leaders is attenuated; however, we do not agree that it is limited to financial concerns or that it is minimal. The burden, in the constitutional sense, is that, in the context of a discharge of a minister, Church will have to explain, and perhaps even justify, its decision to the state. Although that burden is not as direct as the burden described in *Rayburn,* it is sufficient to trigger the balancing inquiry as required by

*Rogue Valley. See Rayburn,* 772 F2d at 1168 (holding that "[a]ny" restriction constitutes a burden on free exercise).

■     With respect to the second factor, in *Rogue Valley,* the Oregon Supreme Court identified the compelling state interest involved here:

> "There are few governmental tasks as important as providing for the economic security of its citizens. A strong unemployment compensation system plays a significant role in providing this security. Given the existence of FUTA, any state's unemployment tax must, as a practical matter, comply with FUTA's requirements or the state's employers would face a double tax. Such a double tax would, in turn, create a very undesirable business climate in the state. This, combined with Oregon's constitutional interest in treating all religious organizations equally, creates an overriding state interest in applying the unemployment payroll taxes to all religious organizations." 307 Or at 499.

Given these competing and important interests, we must now balance the burden on Church's free exercise rights against the " 'impediment to * * * [the state's] objectives that would flow from recognizing the claimed * * * exemption.' " *Rayburn,* 772 F2d at 1168 (internal citations omitted; brackets and ellipses in original).

Church attempts to resolve that tension without conducting a balancing inquiry, urging that the body of church autonomy cases stand for the single principle that "civil authorities simply have no jurisdiction [in all circumstances] to review a church's decision to discharge a minister." We do not share Church's broad reading of that precedent nor do we agree with its suggestion that, in this instance, the result is so obvious that we may forgo the balancing effort required by the free exercise analysis. Furthermore, for the reasons that follow, we hold that here the balance weighs in favor of the state.

As previously expressed, the balancing inquiry requires a weighing of the burden on free exercise against the " 'impediment to * * * [the state's] objectives that would flow from recognizing the claimed * * * exemption.' " *Rayburn,* 772 F2d at 1168 (internal citations omitted; brackets and ellipses in original). In conducting that inquiry, the *Rayburn*

court concluded that "[w]hile an unfettered church choice may create *minimal* infidelity to the objective of Title VII, it provides *maximum* protection of the First Amendment right to the free exercise of religious beliefs." *Id*. at 1169 (emphasis added). Put differently, the *Rayburn* court determined that the "impediment" to the state's objectives was small and thus outweighed by the right of free exercise. The court so concluded because, under the circumstances, the claimed exemption from the employment discrimination law was isolated to a discrete employment environment—*i.e.*, the hiring and firing of ministers—and the law continued to protect citizens in all other employment contexts. In contrast, in this case, the "impediment" to the state's objectives is extreme.

Church seeks a wholesale invalidation of OAR 471-031-0090, the effect of which would extend far beyond ministers in particular and would threaten the economic security of all Oregonians. *See Rogue Valley*, 307 Or at 499 (holding that a FUTA-compliant unemployment compensation system protects, in a significant way, the economic security of all Oregon's citizens.) As we discussed in response to Church's first assignment of error, OAR 471-031-0090 obtains FUTA compliance by *including* all ministers in the system, a result compelled by the equality requirements of Oregon's religion clauses, as announced in *Rogue Valley* and *Salem College*. In light of those equality requirements, a facial invalidation of OAR 471-031-0090 would have the effect of *excluding* all ministers from the system and thus put Oregon's unemployment compensation system out of compliance with FUTA. Such a result would not only impair the state's goal, it would effectively eliminate it. The weight of that impairment does not end our inquiry, however. We must still weigh that factor in the balance and determine which interest prevails.

■ No court has squarely addressed the unique circumstance here, and, thus, no court has determined the proper weight to ascribe to the free exercise interest implicated by including ministers in the unemployment compensation system. However, *Serbian Orthodox*, *Rayburn*, and other similar cases instruct that the weight of a church's right to free exercise is related to two factors: (1) the degree to which the state action affects matters at the heart of a religious organization's internal structure, such as the selection of clergy

and matters of faith, custom or ecclesiastical law; and (2) the degree to which the state action will directly affect, change or coerce a religious organization's decision making about such matters. *Accord* Laycock, 81 *Colum L Rev* at 1402-14.

As to the first factor, this case is similar to *Serbian Orthodox*, *Rayburn*, and the other church autonomy cases in one significant way: the disputed state action—*i.e.*, the disqualification inquiry as it relates to ministers—implicates an ecclesiastical matter that goes to the very heart of a religious organization's autonomy. It is the second factor, however, that distinguishes this case from *Serbian Orthodox*, *Rayburn*, and the others.

Here, even by including ministers in the unemployment compensation system, a church retains substantial discretion to choose and control its ministers. That is so because, despite the outcome of the benefits process, the Department has no authority in any case to change or modify a church's discharge decision. In that light, the inquiry as to the reasons for the discharge does not have the same kind of direct, coercive effect as, for example, the situation in *Serbian Orthodox* where the lower state court's ruling *changed* the church's decision, or the case in *Rayburn* where the application of Title VII to a church's hiring decision would have directly *added to* the church's pastoral selection standards. In the absence of direct coercion, Church's claimed right to free exercise is best described as concerning generally its right to remain free of *any* requirement that it *explain* to the state its ministerial employment decisions. We agree that such an explanation is offensive to principles of church autonomy. However, because the inquiry does not by itself have the power to change a church's decision as to a minister's work status, it is in that sense reasonably characterized as an "incidental" burden on Church's free exercise rights.[11]

■        Keeping in mind that Church here has asserted a facial challenge that significantly increases the magnitude of the "impediment" to the state's objectives involved in this

---

[11] We note that there is no question as to the constitutionality of subjecting religious organizations to the unemployment compensation system, including its regulatory procedures and costs. *Salem College*, 298 Or at 485-87; *Rogue Valley*, 307 Or 496-99.

case, we cannot attribute a weight to such an incidental burden that overbalances the state's important interest in providing for the economic security of its citizens. We therefore hold, in this instance, because the intrusion upon church autonomy is sufficiently attenuated, and the state's interest in providing for the economic security of all Oregonians is sufficiently strong, that Church's facial challenge to OAR 471-031-0090 must fail. The Board did not err.

In claimant's first assignment of error, he contends that the Board erred in failing to award him attorney fees because this case involved a matter of public importance and that the Department should have the equitable power to award attorney fees in circumstances such as these. We disagree. The Department is an administrative agency and, as such, derives its powers from the statutes creating it; it has no equitable authority. *Oregon Occupational Safety v. Don Whitaker Logging*, 123 Or App 498, 500-01, 861 P2d 368 (1993), *rev den* 318 Or 326 (1994). Thus, because no statute authorizes the Department to award attorney fees in this instance, the Board correctly denied claimant's request.

Claimant's second assignment of error involves the Department's failure to admit evidence related to the attorney fee issue. However, because claimant's concern here is predicated on the existence of the Department's authority to award attorney fees, a power that, as noted, does not exist, it is unnecessary for us to consider the evidentiary question.

In claimant's third assignment of error, he argues that the Department erred in failing to award interest on each installment of unemployment benefits, asserting that ORS 82.010(1) gives him the right to receive such interest. The Department contends otherwise, arguing that ORS 82.010(1) does not apply. Claimant is correct.

In the absence of a contractual right to collect interest, that right must derive from a statute. *Thomas v. Senior and Disabled Services Div.*, 319 Or 520, 524, 878 P2d 1081 (1994). Here, ORS chapter 657 is silent with respect to interest. Because there is no express provision for interest in ORS chapter 657, claimant bases his right to collect interest on ORS 82.010(1)(a), which is the general interest statute and

which provides that interest at the statutory rate "is payable on: (a) All moneys after they become due * * *."

The quoted language of ORS 82.010(1)(a) is unambiguous; all moneys means all moneys. *Id.* Because an accepted claim under ORS chapter 657 is due and owing at a specific time, ORS 82.010(1)(a) entitles claimant to interest on those "moneys" after payment is due. *Accord id.* at 525.

The lack of an ambiguity notwithstanding, the Department urges a statutory analysis that leads to a contrary result. At bottom, the Department contends that this case is similar to *Haret v. SAIF*, 72 Or App 668, 697 P2d 201, *rev den* 299 Or 313 (1985), in which we held that an injured worker was not entitled to interest under ORS 82.010 because the Workers' Compensation Law provided the exclusive remedies for workers claiming benefits under its provisions. That analogy does not work here, however.

In *Haret*, we based our holding on the existence of certain provisions of the Workers' Compensation Law, such as the penalty provisions for unreasonably delayed payment, the provisions allowing a worker to keep money already paid, even though it was later determined that the worker was not entitled to that compensation, and the lack of any provision for interest. *Id.* at 673. When viewed as a whole, we determined that the law demonstrated a clear legislative intent to set forth a "complete statement of the parties' rights and obligations." *Id.* at 674.

Because similar provisions, either exactly or in kind, do not exist in ORS chapter 657, our holding in *Haret* does not compel a similar result here. Significantly, there are no penalty provisions for unreasonably delayed payment of a claim, a fact that persuades us that ORS 82.010(1)(a) should apply to an unemployment compensation claim. That is so because an award of interest, like the imposition of a penalty for delayed payment, "avoids the unjust enrichment of a debtor who retains the use of money that it should rightfully have paid to its creditor." *Id.* at 673. In other words, it is fair and just that a claimant should enjoy the full value of a claim when it becomes due and should not suffer a reduction in value that would result from a delayed payment. Because there is no statutory provision negating claimant's right to

interest, and because we can identify no logical rationale for excluding an accepted unemployment claim from the general right to interest provided by ORS 82.010(1), we hold that the Board erred in determining that claimant was not entitled to interest. Further, because the Department did not consider claimant's argument and thus failed to make a final determination as to when payments on claimant's claim became due and owing, we remand to the Department for that determination in the first instance and, if necessary, an award of interest.

Affirmed on petition; reversed in part on cross-petition and remanded.